*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

FRANK CORRIDORE,

Defendant-Appellant.

UNPUBLISHED
June 27, 2019

No. 338670
Oakland Circuit Court
LC No. 2016-258556-FH

Before: CAMERON, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

Defendant, Frank Corridore, appeals his jury-trial conviction of second-degree criminal sexual conduct (CSC-II), MCL 750.520c(1)(a), for which the trial court sentenced him to 19 months to 15 years in prison. On appeal, Corridore raises numerous claims of ineffective assistance of counsel, as well as prosecutorial misconduct, evidentiary error, and a challenge to the scoring of offense variables (OVs) 13 and 15. We affirm.

## I. FACTS AND PROCEEDINGS

Corridore is the paternal grandfather of the victim. Although the victim resided in Ohio with her parents, she and her brother frequently visited Corridore and their grandmother at the grandparents' home in South Lyon, Michigan. According to the victim, during a visit to Corridore's house over the Christmas holiday in 2015, when the victim was 10 years old, Corridore put his hand in her pants and touched her vagina. The victim testified that similar conduct had occurred during every visit with Corridore, in either Michigan or Ohio, beginning when she was approximately six years old.

The victim did not disclose these incidents to her parents until January 27, 2016. The incident that led to the victim's disclosure occurred on January 23, 2016, when Corridore exchanged text messages with the victim while she was having a sleepover with her friend, SV. Corridore disapproved of the victim's friendship with SV because he allegedly had witnessed an incident of inappropriate sexual contact between the two children. When Corridore learned that SV was with the victim at the sleepover, he asked the victim to go into a bathroom alone and call him using Facetime. When the victim called Corridore from the bathroom, he asked her to show

-1-

him "what's down there." The victim refused to comply because her mother had warned her about the dangers of using her phone to send nude photos, a practice known as "sexting." The victim later told SV about Corridore's request and SV told her own mother, who then informed the victim's parents. On January 27, 2016, the victim's mother asked her daughter if she was upset about anything that happened at the sleepover. The victim initially did not know what her mother was referring to, but then disclosed the sexting request. The victim then reportedly "blurt[ed] out without prompting" that Corridore had put his hands in her pants during every visit. The victim's father joined the discussion. The victim repeated the same disclosures to him.

The victim's parents notified Child Protective Services (CPS) in Ohio. A forensic interview and medical examination was done in Ohio. In Michigan, Detective Timothy O'Dea investigated the allegation. The investigation caused a division in the family, with the victim's parents supporting her accusations, and Corridore's wife and his other sons supporting Corridore's claim of innocence.

Corridore's first trial ended in a mistrial when the jury was unable to reach a verdict. At Corridore's second trial, the defense theory was that the victim's parents were overly credulous in believing their daughter's sexual assault allegations and that Corridore made a sexting request. Both parties presented expert testimony regarding forensic interviewing of children regarding sexual abuse. The prosecution's expert, Sarah Killips, testified that forensic interview protocols were developed to minimize the risk that a person questioning the child will suggest or influence the child to falsify or embellish reports of sexual abuse. Killips reviewed an e-mail that the victim's mother sent to Corridore's wife, in which she described how the victim disclosed the abuse. The victim's mother described how she had questioned the victim. Killips opined that the victim's mother's "interview" was reasonably compliant with forensic interview protocols. In contrast, Corridore's expert, Katherine Jacobs, Ph.D., testified that, although forensic interview protocols were designed to minimize the risk of improper influence, there is still a risk of such influence if the child is questioned by parents and law enforcement officers prior to the forensic interview. Defense counsel also suggested that the victim was not credible because she was angry at Corridore for trying to break up her friendship with SV, and that the victim's continued reports were influenced by the reinforcement she received from her parents and investigators, who were unwilling to objectively look at the facts to consider alternative explanations for the victim's allegations.

The jury found Corridore guilty of CSC-II.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Corridore filed a posttrial motion for a new trial in which he raised several claims of ineffective assistance of counsel and requested a *Ginther* hearing.[1] The trial court denied Corridore's motion and also denied his request for a *Ginther* hearing. On appeal, Corridore

---

[1] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

again argues that he did not receive the effective assistance of counsel at trial. Because a *Ginther* hearing was not held, our review of this issue is limited to errors apparent on the record. *People v Seals*, 285 Mich App 1, 17; 776 NW2d 314 (2009).

"Whether a defendant has been denied the effective assistance of counsel is a mixed question of fact and constitutional law." *People v Solloway*, 316 Mich App 174, 187; 891 NW2d 255 (2016). To establish ineffective assistance of counsel, Corridore must show that "(1) counsel's performance was deficient, meaning that it fell below an objective standard of reasonableness, and (2) but for counsel's error, there is a reasonable probability that the outcome of the defendant's trial would have been different." *Id.* at 188. "This Court does not second-guess counsel on matters of trial strategy, nor does it assess counsel's competence with the benefit of hindsight." *People v Foster*, 319 Mich App 365, 391; 901 NW2d 127 (2017) (citation omitted).

## A. FAILURE TO EFFECTIVELY PRESENT EXPERT TESTIMONY

Corridore argues that defense counsel's examination of Dr. Jacobs was deficient because he failed to elicit testimony applying her opinions to the facts of this case. Although Dr. Jacobs provided comprehensive testimony regarding the risk that a parent or police officer will influence the disclosures a child will make in a forensic interview, she did not offer testimony applying this information to reach a conclusion about the events of this case. Corridore argues that such testimony would have established that the victim's memory and report of sexual abuse were already tainted before she underwent forensic interviewing.

"[D]ecisions regarding what evidence to present, what evidence to highlight during closing argument, whether to call witnesses, and how to question witnesses are presumed to be matters of trial strategy." *People v Putman*, 309 Mich App 240, 248; 870 NW2d 593 (2015) Defense counsel's failure to present evidence constitutes ineffective assistance only if it deprived the defendant of a substantial defense. *Id*. A substantial defense is one "that could have affected the outcome of the trial." *Id*.

Corridore argues that there was no strategic reason for defense counsel's failure to pursue a line of questioning directly targeting the process by which the victim's disclosures were revealed. We disagree. Contrary to Corridore's argument on appeal, Dr. Jacobs's testimony was not offered without context. Dr. Jacobs's testimony regarding parents' tendencies to ask suggestive questions in a manner likely to elicit certain answers could readily be applied to the parents' testimony at trial, and to the narrative that the victim's mother wrote in the e-mail she sent to Corridore's wife. Defense counsel's examination of Dr. Jacobs addressed factual scenarios that counsel had already explored in his cross-examination of prosecution witnesses and served the strategic purpose of allowing the jury to decide for themselves whether the victim's disclosures could be considered unreliable because she was influenced by her parents' efforts to ask her about SV's mother's report.

We disagree with Corridore's claim that our Supreme Court's decisions in *People v Armstrong*, 490 Mich 281; 806 NW2d 676 (2011), and *People v Grant*, 470 Mich 477; 684 NW2d 686 (2004), support his argument that defense counsel was ineffective.

-3-

In *Armstrong*, the defendant, a 25-year-old male, was charged with criminal sexual conduct involving a 15-year-old female complainant. The defendant's trial counsel failed to timely admit cell phone records, which would have rebutted the complainant's testimony that she did not attempt to contact the defendant after the second alleged sexual assault. *Armstrong*, 490 Mich at 287. The prosecutor told the jury in closing argument that it must disregard the cell phone records because they were not properly admitted into evidence, and the prosecutor suggested that the cell phone records were fabricated. *Id*. at 287. At a *Ginther* hearing, the defendant's trial counsel testified "that he failed to subpoena the custodian of the cell phone records because of the mistaken belief that the business records exception to the hearsay rule did not require a custodian to testify." *Id*. at 288. He testified that he believed "it would be sufficient to have the complainant acknowledge her phone number on the statement." *Id*. The trial counsel also admitted that he intended to introduce the record, but "he became flustered following the prosecution's successful objection and therefore made no further attempt to have the records admitted." *Id*. at 288. He admitted that "his failure to pursue introduction of the records 'was not a strategic decision, nor did [he] at any time during trial decide that the phone records were not necessary or beneficial to the defense case.' " *Id*.

Our Supreme Court concluded that the defendant's trial counsel's performance fell below an objective standard of reasonableness. The Court also rejected the prosecution's argument that failure to obtain the records constituted sound trial strategy because the records "would have caught the complainant in a lie." *Id*. at 290. The Court found that the defendant was prejudiced because the defense theory was that the complainant falsely accused the defendant, but the attacks on the complainant's credibility "were inconclusive, providing mere 'he said, she said' testimony contradicting the complainant's version of the events." *Id*. at 291. The Court noted that the cell phone records contradicted the complainant's testimony that she cut off contact with the defendant because "she had absolutely no wish to call or speak to defendant after having undergone such a harrowing experience." *Id*.

In *Grant*, the defendant was convicted of three counts of criminal sexual conduct involving his two nieces, on two occasions. *Grant*, 470 Mich at 479-480. The older girl, who was eight years old, suffered "a tear from the rear of her vaginal opening to her anus" the day of the first alleged incident. *Id*. at 481. She told her parents and the treating physician that the injury was caused by a bicycle accident. *Id*. "The examining doctor described the injury as a 'clean' tear, consistent with a straddle injury, rather than a ragged tear consistent with abuse." *Id*. The physician "prepared an initial report of his examination that included the older girl's statements," and "a subsequent report that concluded that, alternatively, her injury could have been caused by sexual abuse." *Id*. The second alleged incident occurred about one year later. The complainant told her friend, who told her mother, who called CPS. The older girl was given a medical examination, in which "she said that defendant had raped, then threatened her, demanding that she fabricate the bicycle accident to explain her injury." *Id*. The prosecutor's theory at trial was that the complainant fabricated the bicycle accident and emphasized the fact that there was no eyewitness testimony supporting the occurrence of a bicycle accident. *Id*. The defendant's trial counsel had a copy of the doctor's initial report made following the first alleged incident of sexual assault, and had knowledge of or had copies of the doctor's subsequent report, as well as the doctor's report following the second alleged incident of sexual abuse. *Id*. at 482, 488-489. The defendant gave him a list of at least 12 potential witnesses. *Id*. at 482. His trial

counsel failed to interview all of the witnesses, and therefore was unaware that two of the sisters' cousins could have testified that they saw the complainant injure her genital area in a bicycle accident. *Id*. at 482. Defense counsel presented "a three-pronged theory: (1) defendant did not commit the crimes, if they even occurred; (2) the injury to the older girl was the result of the bicycle accident; and (3) this girl habitually made up things." *Id*. The prosecution's evidence consisted mainly of the testimony of the older girl, "who stated that defendant had severely injured her during an incident of sexual misconduct." *Id*. at 479. The defendant "maintained that he was innocent and that the injury this girl sustained was caused by a bicycle accident, as she had originally related." *Id*. at 479-480. Our Supreme Court observed:

> By the time the *Ginther* hearing was held before the trial court, the two cousins only vaguely recalled the incident. This is not surprising considering that the alleged accident had occurred more than five years earlier when they were about ten and six years old. The trial court ruled that the evidence was not sufficiently probative to support a determination that counsel was ineffective for failing to ascertain and introduce it. It appears that the trial court's decision was based on the fact that the witnesses were unable to remember the incident clearly at the time of the *Ginther* hearing.
>
> Defendant again appealed. The Court of Appeals, apparently analyzing only the *Ginther* hearing testimony, agreed with the trial court that the evidence "would not have been of substantial benefit to the defense." Unpublished memorandum opinion of the Court of Appeals, issued May 1, 2001 (Docket No. 214941, 2001 WL 672402). [*Grant*, 470 Mich at 483-484.]

The Supreme Court concluded that trial counsel's performance "was not objectively reasonable" where the defendant faced three counts of CSC, two of which "were founded wholly on the sisters' statements implicating defendant," and one of which was "founded on the older girl's statements and an underlying physical injury." *Id*. at 486. The Court stated:

> The best refutation of all the charges would have been strong substantive evidence that the older girl's injury was caused by something or someone other than defendant. Had that charge been defeated, then the other two would have been greatly weakened, given the questionable credibility of the two girls as witnesses. The development of defense counsel's trial strategy had to consider these facts. His failure to conduct a more thorough investigation to uncover evidence to support an alternate causation theory was objectively unreasonable. [*Id*. at 486.]

The majority of the Court did not agree with the dissenting justices' conclusion that the defendant's trial counsel made an informed strategic choice. *Id*. at 510 (CORRIGAN, C.J., dissenting). Rather, the majority concluded that the defendant's trial counsel was unprepared for trial because he failed to realize that he should have called available witnesses who could have given substantive testimony negating the prosecutor's physical evidence that her injury was not caused by the abuse alleged. *Id*. at 490-492. The majority also determined that trial counsel did not disregard one theory of defense in favor of another. *Id*. at 492. The Court reversed the defendant's convictions and remanded for a new trial based on ineffective assistance of counsel. *Id*. at 498.

This case is distinguishable from *Armstrong* and *Grant*. In this case, defense counsel did not ignore or fail to discover critical evidence to counter the prosecution's evidence. He also did not rely solely on cross-examination to attack the victim's credibility. Rather, he elicited from other witnesses facts and circumstances surrounding the victim's report of sexual abuse, and then in turn elicited testimony from Dr. Jacobs that addressed how similar facts and circumstances can influence a child's report of sexual assault and render that report unreliable. Dr. Jacobs's testimony enabled defense counsel to apply the other witnesses' testimony to the facts and circumstances of the case to offer a comprehensive explanation for why the victim's disclosures should be deemed unreliable. In hindsight, this strategy might have been more persuasive if defense counsel had challenged Dr. Jacobs about her conclusions regarding the victim's disclosures, in addition to laying the groundwork for the jury to draw these conclusions for itself, but this does not establish that counsel was ineffective.

Corridore argues that defense counsel erred by failing to examine Dr. Jacobs regarding her finding that the pattern of disclosure in this case was inconsistent with research concerning how victims generally disclose sexual assault. Dr. Jacobs's written report included a section with the subheading: "Current research on the ways that alleged victims of sexual abuse make disclosures." Dr. Jacobs wrote that "[a] popular but outdated theory holds that disclosure of sexual abuse is commonly a process of partial, incremental revelations made over time rather than a single and complete report, with denial and recantation common." She cited studies finding that "although victims may not tell about abuse until they are asked, the vast majority of those cases where abuse is strongly documented do give a complete rendition when first asked." She stated that, in the forensic interview, the victim reported incidents in which Corridore bit her on the breast, and in which he picked up her hand and moved it toward his body. Under MRE 703, "[t]he facts or data in the particular case upon which an expert bases an opinion or inference shall be in evidence." According to Dr. Jacobs's statements in her report, the forensic interview revealed that the victim disclosed additional incidents of abuse that were not explored or highlighted at trial. Corridore has not overcome the presumption that defense counsel reasonably refrained from questioning Dr. Jacobs on this subject to avoid opening the door to the potentially damaging introduction of these additional allegations.

Corridore also argues that defense counsel was ineffective for failing to follow Dr. Jacobs's recommendations for cross-examining Killips. After Corridore's first trial, Dr. Jacobs sent defense counsel five pages of remarks concerning Killips's testimony and recommended strategies for attacking it at Corridore's second trial. Contrary to what Corridore argues, defense counsel did not ignore Dr. Jacobs's recommendations. In particular, Dr. Jacobs recommended that defense counsel "shut down" Killips's testimony regarding grooming, and defense counsel objected when the prosecutor asked Killips to explain grooming. Although the trial court allowed some testimony on the subject, ultimately it refused to allow "any detailed questioning about grooming." Further, defense counsel's cross-examination of Killips reflected his familiarity with her testimony and counsel highlighted its weaknesses. Whether he should have cross-examined Killips more aggressively was a matter of trial strategy. His method and scope of cross-examination was not objectively unreasonable.

Corridore also argues that defense counsel should have obtained Killips's report before the second trial. But because defense counsel was already familiar with Killips's testimony from Corridore's first trial, it was not objectively unreasonable for him to not obtain the report before

Corridore's second trial. Indeed, Corridore does not cite anything in Killips's report that would have enabled counsel to perform more effectively at his second trial. He does not cite any deviation between Killips's first trial testimony and the report that would have alerted counsel that a different strategy was necessary. Corridore thus also fails to establish that he was prejudiced by counsel's failure to obtain the report.

## B. FAILURE TO OBJECT TO HEARSAY TESTIMONY

Corridore argues that defense counsel was ineffective for failing to object to all of the victim's mother's testimony repeating the victim's disclosures. He argues that defense counsel should have more effectively opposed the admission of her testimony under the excited utterance exception to the hearsay rule. The trial court sustained defense counsel's first hearsay objection, but overruled his second objection following the victim's mother testimony regarding her questioning of the victim and the victim's demeanor during their discussion. Defense counsel did not object on a third occasion when the victim's mother testified about what the victim told her regarding Corridore's sexual assaults. Defense counsel argued that neither the present sense impression nor excited utterance exceptions to the hearsay rule applied when the victim's mother testified that the victim repeated her disclosures after the victim's father joined the discussion.

The first question is whether the victim's mother's testimony about her initial discussion with the victim was admissible under the excited utterance exception to the hearsay rule. Corridore argues that these statements could not constitute excited utterances because were not made under the stress from either the Christmas visit assault or the Facetime incident. "In general, hearsay—an out-of-court statement offered to prove the truth of the matter asserted—may not be admitted into evidence." *People v Green*, 313 Mich App 526, 531; 884 NW2d 838 (2015), citing MRE 801 and MRE 802. MRE 803(2) provides a hearsay exception for an excited utterance, which is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The two requirements for an excited utterance are "1) that there be a startling event, and 2) that the resulting statement be made while under the excitement caused by the event." *People v Smith*, 456 Mich 543, 551; 581 NW2d 654 (1998). "[I]t is the lack of capacity to fabricate, not the lack of time to fabricate, that is the focus of the excited utterance rule. The question is not strictly one of time, but of the possibility for conscious reflection." *Id*.

Our Supreme Court's decision in *Smith* is instructive where the complainant, a 16-year-old high school student, socialized with the defendant, an adult 15 years his senior. The defendant was a bodybuilder who was eight inches taller and 100 pounds heavier than the complainant. *Id*. at 546-547. The defendant invited the complainant to watch a movie at the defendant's home. *Id*. at 546. Over the course of the evening, the defendant solicited sexual favors from the complainant, threatened him with a pair of scissors, refused to drive the complainant home or allow him to use the telephone, and gave him a "choice" of fighting the defendant or allowing the defendant to perform fellatio on him. *Id*. at 546-548. The complainant returned home at 1:45 a.m., visibly upset. *Id*. at 548. When his mother asked him what was wrong, he told her to leave him alone. *Id*. At 11:00 a.m. the following morning, he asked his parents to buy him a weightlifting bench. *Id*. at 549. He became upset when they responded by indicating that they might buy it in the near future. *Id*. When his mother asked what was wrong, he replied, "Oh, mom, I had to be sucked off last night before I can [sic] even come home." *Id*.

At trial, the defendant objected to the mother's testimony on hearsay grounds. *Id*. The trial court admitted the statement as an excited utterance. *Id*. Our Supreme Court agreed that the complainant was still subject to the stress of the assault:

> We find that the complainant's actions upon arriving home were extraordinary. When he arrived home at approximately 1:45 a.m., he took an hour-long bath and let the water run that entire time. Afterward, he paced the living room and his mother observed him punching his fist into his hand. At approximately 5:30 a.m., complainant uncharacteristically slept on the couch, though his bedroom adjoined the living room. His mother observed that he appeared to have been crying. At approximately 11 o'clock the next morning, the complainant asked his father and mother separately for a weight bench. His father said maybe, and later, when his mother said yes, but not for three months, complainant broke into tears. When his mother asked what was wrong, complainant made the statement in question. We agree with the trial court that these circumstances describe a continuing level of stress arising from the assault that precluded any possibility of fabrication. [*Id*. at 552-553.]

The Court also rejected the defendant's argument that the statement was made in response to questioning. *Id*. at 553-554. Our Supreme Court held "whether a statement made in response to questioning should be excluded under MRE 803(2) depends on the circumstances of the questioning and whether it appears that the statement was the result of reflective thought." *Id*. at 553. The Court remarked that the mother's questions were not suggestive, neither were they persistent and insistent. *Id*. at 554. The Court concluded, "There is nothing about the mother's inquiries in the present case that undermines confidence in the conclusion that the complainant's statement resulted from the stress of the assault and not from the 'stress' of his mother's inquiries." *Id*. at 554.

In *People v Straight*, 430 Mich 418, 420; 424 NW2d 257 (1988), the victim stayed with the defendant while her mother ran errands. In the following weeks, the victim "had recurring nightmares and a poor appetite, experienced vomiting, and was irritable." *Id*. at 421. The child was examined at a hospital, but no physical evidence of sexual assault was found. *Id*. at 421. The victim's parents questioned her about the defendant. At trial, they were permitted to testify about the conversation. *Id*. at 421. The Supreme Court held that the child's statements were not made while the child was under the stress caused by the assault because "the statements at issue were made approximately one month after the alleged assault, immediately after a medical examination of the child's pelvic area, and after repeated questioning by her parents." *Id*. at 425-426. The Court concluded that "[u]nder these circumstances, it simply cannot be concluded that the statements were made 'while the declarant was under the stress of excitement *caused by the event or condition*'" because "one cannot safely say that [the child's] stress resulted from the alleged assault rather than from a combination of the medical examination and repeated questioning." *Id*. at 426.

We agree that the victim's mother's testimony regarding the victim's disclosures did not come within the excited utterance exception. Unlike the complainant in *Smith*, 456 Mich 543, the victim was not continuously distressed between either the Facetime incident or the alleged Christmas visit assault and her disclosure to her mother. Instead, the facts here more closely

align with those in *Straight*. In this case, similar to the facts in *Straight*, the victim testified that she was upset about the Facetime incident, but there was no testimony that she remained upset as she continued her sleepover with SV, and she resumed her normal life activities the following morning. The disclosure to her mother was not made immediately; instead, as in *Straight*, there was a long gap in time between the assault and the disclosure. The victim did not initiate the discussion with her mother, and she was not upset when her mother initiated it. The victim's mother testified that the victim appeared confused about why her mother was questioning her, and the victim did not show signs of stress until her mother asked her if anything other than the rough-housing incident with SV happened during the sleepover. There were no physical factors "such as shock, unconsciousness, or pain" that prolonged the period "in which the risk of fabrication is reduced to an acceptable minimum." *Smith*, 456 Mich at 551-552. Accordingly, we conclude that the victim's statements did not qualify as excited utterances, and thus a legal basis existed for objecting to the victim's mother's testimony on hearsay grounds. That conclusion, however, does not resolve Corridore's ineffective-assistance claim.

The prosecution argues that defense counsel's decision not to object to all of the victim's statements made to her parents was consistent with the defense strategy. We agree. A central theme of Dr. Jacobs's expert testimony was that parental questioning of children may elicit false disclosures if the parent, intentionally or unintentionally, asks questions in a manner that influences a child's memory. The jury could not have construed Dr. Jacobs's testimony as a challenge to the reliability of the victim's disclosures without knowing how the conversation transpired between the victim's mother and the victim. Defense counsel's cross-examination of the victim's father suggested that he misinterpreted the victim's matter-of-fact attitude about Corridore touching her as proof of Corridore's grooming, rather than a sign that the disclosures were false. This line of cross-examination could not be effective if the jury did not know the content of the victim's disclosures to her parents. Although the strategy ultimately was not successful, it was not an unreasonable choice by defense counsel. "A failed strategy does not constitute deficient performance." *People v Petri*, 279 Mich App 407, 412; 760 NW2d 882 (2008).

Corridore also argues that defense counsel was ineffective for allowing the prosecutor to elicit multiple repetitions of the victim's disclosures and for eliciting repetitions in his own cross-examination of the victim's mother, the victim's father, and Detective O'Dea. He argues that these repetitions tipped the scale in a trial that was a "pure credibility contest." Corridore relies on *People v Douglas*, 496 Mich 557; 852 NW2d 587 (2014), to support his argument.

In *Douglas*, the complainant, KD, was the daughter of the defendant and Jessica Brodie. KD, who was 3½ years old at the time, lived with the defendant from May 2008 until January 2009. *Id*. at 561. KD then lived with Brodie, but spent alternate weekends with the defendant. *Id*. at 562. According to Brodie, in June 2009, KD spontaneously disclosed separate incidents in which the defendant made her perform fellatio on him and touch his penis. *Id*. KD's therapist contacted CPS, which arranged for KD's forensic interview at Care House. *Id*. KD discussed the alleged fellatio and touching in the interview. *Id*. At trial, the forensic interviewer testified regarding the statements that KD made in the interview. *Id*. at 563, 569-570. The video recording of the forensic interview was played for the jury. *Id*. at 563, 571, 573. Our Supreme Court held that the trial court erred by admitting KD's statements from the forensic interview because the requirements of MRE 803A, the "tender years exception" to the hearsay rule, were

not satisfied. *Id*. at 573-579. The Court also concluded that the statements were not admissible under the hearsay catch-all exception, MRE 803(24). *Id*. at 576-579. The Court further concluded that the erroneous hearsay admissions were not harmless error because they unfairly tipped the weight of the evidence in the prosecution's favor. Our Supreme Court stated:

> This case presented the jury with a pure credibility contest; there were no third-party witnesses to either instance of alleged abuse, nor any physical evidence of it. As such, the prosecution's case hinged heavily on KD's credibility in her accounts of the alleged abuse, particularly the fellatio. With regard to the alleged fellatio, the only accounts properly before the jury were KD's testimony at trial, and Brodie's testimony regarding KD's prior disclosure of it to her. The credibility of these accounts, and Brodie's motives and influence in connection with them, were the focus of the defense and a central issue at trial. As a result of the court's error, however, the prosecution was not limited to this evidence, and instead the jury was permitted to hear from KD twice more: first, through the hearsay testimony offered by Wheeler, and then again through the video recording of KD's forensic interview. [*Douglas*, 496 Mich at 580.]

Relying on *Douglas*, Corridore argues that defense counsel's complicity in the admission of repetitive hearsay was an outcome-determinative error. In *Douglas*, however, this issue was presented as a claim of evidentiary error, not as a claim of ineffective assistance of counsel. Accordingly, the decision in *Douglas* did not consider that a defense strategy might focus on the introduction of a complainant's out-of-court statements for the purpose of proving that the complainant's trial testimony was tainted by suggestive questioning. Instead, in this case, the record indicates that defense counsel's decisions not to object and to affirmatively inquire into the victim's statements to the victim's mother, father, and Detective O'Dea were part of a reasonable strategy of persuading the jury that the victim's trial testimony was not credible or unreliable because her disclosures were developed and influenced by these witnesses. Corridore fails to overcome the presumption that counsel pursued a reasonable, though not successful, strategy.

## C. FAILURE TO OBJECT TO VOUCHING TESTIMONY

Corridore identifies 18 instances in which the victim's parents and Detective O'Dea indicated that they believed the victim's accusations. Most of these instances occurred during defense counsel's cross-examinations. In *Douglas*, 496 Mich at 583-587, our Supreme Court held that trial counsel was ineffective for failing to object to testimony by Wheeler (a forensic interviewer), Fallone (a CPS worker), and Muir (a police detective) that the complainant was believable. The Court concluded that the defendant's trial counsel's failure to object was outcome determinative because "the prosecution's case hinged wholly on the credibility of KD's allegations, making defense counsel's success in undermining that credibility all the more critical." *Id*. at 586. The Court noted that the three witnesses in question were "three figures of apparent authority and impartiality, with direct involvement in and knowledge of the investigation leading to the defendant's prosecution . . . ." *Id*.

Although Corridore accurately describes the trial as a credibility contest, it was not as straightforward a credibility contest as in *Douglas*. Defense counsel employed a strategy of

discrediting the victim and her parents, in addition to attacking Detective O'Dea for bias and lack of neutrality in his investigation. Defense counsel did not attempt to conceal or downplay these witnesses' supposed acceptance of the victim's accusations. Instead, he openly challenged them. One of defense counsel's strategies was to show that there were alternative interpretations to different facts and events described by the witnesses, including Corridore's alleged remark to the victim to show him "what's down there." An apparent purpose of defense counsel's cross-examination of the victim's parents was to portray them as biased and that they rushed to the conclusion that the victim was truthful, notwithstanding Corridore's upstanding character and his devotion to his family. Defense counsel attempted to show that it was irrational for the victim's parents to assume that Corridore's request for the victim to show him "what's down there" meant that he wanted to see the victim's genitals. He tried to establish that the victim and SV twisted Corridore's meaning to retaliate against him for his having made known to her his disapproval of SV. Defense counsel presented evidence that the victim allegedly had watched sexually explicit videos and engaged in sexual play with SV, so she was not as sexually naïve and innocent as her parents believed her to be. Counsel also attempted to show that Detective O'Dea's testimony was not credible because he had abdicated his role as a neutral investigator and instead had become an advocate for the victim, given that he was unwilling to concede any possibility that the victim's disclosures might be false or unreliable, and that he failed to objectively seek and investigate other evidence once he decided that Corridore was guilty.

Viewed in the context of defense counsel's trial strategy, defense counsel was not ineffective for eliciting witnesses' testimony that repeated the victim's statements and expressed confidence in their truthfulness.

## D. FAILURE TO OBJECT TO KILLIPS'S TESTIMONY

Corridore cites six instances at trial in which he contends that Killips's testimony exceeded the scope of permissible expert testimony regarding behavior that is typical of abused children. He further argues that Killips improperly testified regarding behavior by the victim that was consistent with sexual abuse, such as her failure to provide details of every incident of abuse, her disclosure of abuse to a friend before the disclosure to an adult, that she delayed the disclosure, her continued affection to her abuser, and her calm demeanor during the reporting of a sexual assault. Defense counsel did, in fact, object to Killips's testimony that it was not inconsistent for a child to show affection to an abuser.

Corridore relies on *People v Peterson*, 450 Mich 349; 537 NW2d 857 (1995), mod 450 Mich 1212 (1995), in which a social worker testified that the victim "showed behavior manifestations that were symptomatic of sexual abuse." *Id*. at 355. A second social worker testified that "the victim's behavior was consistent with children who have been sexually abused." *Id*. A clinical psychologist, who also was the child's foster parent, testified that the child's "symptoms were consistent with those of a sexual abuse victim." *Id*. at 356. In *Peterson*, the Court analyzed its prior decision in *People v Beckley*, 434 Mich 691; 456 NW2d 391 (1990), and summarized its holdings as follows:

> Thus, the following may be discerned from the opinions in *Beckley*: Seven justices agreed that syndrome evidence is not admissible to demonstrate that abuse occurred and that an expert may not give an opinion whether the

-11-

complainant is being truthful or whether the defendant is guilty. At least five justices agreed that where syndrome evidence is merely offered to explain certain behavior, the *Davis/Frye*[2] test for recognizing admissible science is inapplicable. We continue to adhere to these holdings and reaffirm their application to child sexual abuse cases. [*Peterson*, 450 Mich at 369.]

The Court further stated that it was striking "the appropriate balance by allowing an expert to testify about behavioral traits that may, by their very nature, create confusion in the minds of the jury." *Id*. at 375. The Court concluded that "[w]hen the credibility of the particular victim is attacked by a defendant, we think it is proper to allow an explanation by a qualified expert regarding the consistencies between the behavior of that victim and other victims of child sexual abuse." *Id*. Applying these principles to the *Peterson* case, the Supreme Court held that the expert witnesses were improperly permitted to vouch for the victim's veracity at trial by stating statistics supporting the rarity of false allegations of sexual abuse. One expert stated that only two percent of children's allegations of sexual abuse are false; another stated that 85 percent of children's allegations are truthful. *Id*. at 375-376. The Court acknowledged that "neither witness stated that the child victim was telling the truth," but stated that

> the risk here goes beyond such a direct reference. Indeed, as we have cautioned before, the jury in these credibility contests is looking "to hang its hat" on the testimony of witnesses it views as impartial. Such references to truthfulness as go beyond that which is allowed under MRE 702. [*Id*. at 376.]

The Court further noted that testimony that the victim's behavior was consistent with the behavior of typical sexual abuse victims was improper because "the defendant never argued that the victim's behavior was inconsistent with that of a typical victim of child sexual abuse . . . ." *Id*. at 376-377. The Court further stated with respect to the companion case, *People v Smith*:

> Because *Beckley* has been interpreted to allow expert testimony only to rebut an inference created by the defendant, Smith used the strategy not to directly attack the credibility of a particular victim. Therefore, jurors are often left with misgivings regarding particular behavior of the victim, as in this case regarding the delayed reporting. We therefore find that where there are common misperceptions regarding the behavior of the victim on which a jury may draw an incorrect inference, such as the delayed reporting, the prosecutor may present limited expert testimony dealing solely with the misperception. However, as we noted in *Beckley,* the evidence has very limited use and should be admitted only to state that certain behavioral characteristics are common among victims of child sexual abuse. [*Peterson*, 450 Mich at 379.]

---

[2] *People v Davis*, 343 Mich 348; 72 NW2d 269 (1955); *Frye v United States*, 54 App DC 46; 293 F 1013 (1923).

The Court concluded, however, that the erroneous admission of the evidence was harmless "in light of the overwhelming evidence against the defendant." *Id*. at 380-381.

In *People v Kowalski*, 492 Mich 106; 821 NW2d 14 (2012), our Supreme Court summarized the holding in *Peterson* as follows:

> [W]e have allowed experts to explain other human behavior that is contrary to the average person's commonsense assumptions. In *People v Peterson,* for example, we observed that victims of child sexual abuse sometimes exhibit behavior, such as delayed reporting of abuse or retraction of accusations, that psychologists understand to be common among abuse victims but that jurors might interpret as being inconsistent with abuse. We held that if the victim's credibility is attacked by highlighting this behavior, then a qualified expert may explain the consistencies between the behavior of that victim and that of other victims of child sexual abuse. We further explained that such testimony was helpful to address "behavioral traits that may, by their very nature, create confusion in the minds of the jury." [*Kowalski*, 492 Mich at 123-124, quoting *Peterson*, 450 Mich at 363, 375.]

In this case, Corridore argues that Killips's testimony was improper under *Peterson* because defense counsel did not "open the door" by implying that the victim's behavior was inconsistent with abuse, or that her behavior was indicative of fabrication. We disagree. Defense counsel rigorously cross-examined the victim's father about the stark contrast between the victim's calm demeanor while discussing the sexual touching and her visible distress while discussing the Facetime incident. Defense counsel also questioned the victim's parents regarding the sequence of events in which the victim first disclosed the Facetime incident to SV, who informed her mother, who informed the victim's parents. Corridore elicited and emphasized testimony that the jury could have interpreted as being inconsistent with abuse. Accordingly, an objection to Killips's testimony on the ground that consistency between the victim's behavior and the alleged abuse was not at issue would have been without merit. "Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel." *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010).

## E. ELICITING EXPERT TESTIMONY FROM A LAY WITNESS

Corridore argues that defense counsel improperly elicited the victim's father's testimony that the victim's stomachaches, rectal bleeding, and headaches were signs of stress from the sexual touching. He states that this was improper expert testimony by a lay witness, exacerbated by the victim's father's prior testimony that, because he is a doctor, he received training for detecting possible child abuse. The prosecution argues that the victim's testimony was permissible as lay witness opinion testimony. MRE 701 provides that a witness who is not testifying as an expert may testify "in the form of opinions or inferences" if the opinion is "limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

Defense counsel asked an open-ended question whether the victim's father observed any "tipoffs" of sexual abuse before the victim's disclosure. The victim's father testified that he realized, in retrospect, that the victim's continuing headaches and other ailments may have been triggered by the sexual abuse. This testimony falls within the scope of MRE 701. The victim's father's opinion was based on his observations of the victim. Further, his belief that the victim's ailments may have been connected to Corridore's sexual abuse was a reasonable inference given that there was no other physical explanation for the ailments. This opinion was helpful to understanding that the victim's life was not as normal as it appeared prior to her disclosure of the abuse.

The pertinent question, however, is not whether the testimony was admissible, but whether defense counsel was ineffective for eliciting this testimony. Given that the victim's mother and father both testified that they were shocked by the victim's disclosure, defense counsel's question does not appear objectively unreasonable. Part of the defense strategy in attacking the credibility of the victim's disclosure was to show that even her parents had not noticed anything about her behavior that would give credence to the allegation of sexual abuse. Arguably, asking the victim's father a broad, open-ended question about possible signs of sexual abuse risked opening the door to unanticipated prejudicial testimony, but the risk was mitigated because, when defense counsel pursued a similar line of questioning at the first trial, the victim's father did not testify about the victim's ailments. The mere fact that counsel's strategy was not successful does not constitute deficient performance. *Petri*, 279 Mich App at 412.

Even if defense counsel's cross-examination of the victim's father could be considered objectively unreasonable, it did not affect the outcome of the trial. The parties presented voluminous testimony concerning the victim's allegations that Corridore put his hand in her pants and made a lewd request on Facetime. This testimony explored the sequence of events leading to the victim's disclosures, the family relationships and traditions, and the roles of law enforcement officers and medical personnel in investigating the disclosures. It is not reasonably probable that the limited testimony about "tipoffs" of sexual abuse was a decisive factor in the jury's determination.

### F. REQUEST FOR A *GINTHER* HEARING

Corridore argues that the trial court abused its discretion by denying his request for a *Ginther* hearing. "[A] trial court's decision whether to hold an evidentiary hearing is reviewed for an abuse of discretion." *People v Unger*, 278 Mich App 210, 216-217; 749 NW2d 272 (2008). Although Corridore argues that he is entitled to an evidentiary hearing to enable him to establish a record to support his ineffective-assistance claims, a *Ginther* hearing is required only if a defendant's claim "depends on facts not of record." *People v Ginther*, 390 Mich 436, 442-443; 212 NW2d 922 (1973). Corridore's ineffective-assistance claims pertain to defense counsel's acts and omissions during trial. Therefore, we are able to review Corridore's claims from the trial record. None of Corridore's claims are dependent on evidence of anything said or done outside of the trial. Defense counsel's strategy at trial is apparent from the record, and he was not required to testify to explain his strategy or trial preparation. Accordingly, the trial court did not abuse its discretion by denying Corridore's request for an evidentiary hearing.

## III. EVIDENTIARY ERROR

Corridore argues that the trial court erred by overruling defense counsel's objections to hearsay testimony. "A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. Preliminary questions of law, including whether a rule of evidence precludes the admission of evidence, are reviewed de novo." *People v Wilder*, 502 Mich 57, 62; 917 NW2d 276 (2018) (quotation marks and citation omitted). "If the court's evidentiary error is nonconstitutional and preserved, then it is presumed not to be a ground for reversal unless it affirmatively appears that, more probably than not, it was outcome determinative—i.e., that it undermined the reliability of the verdict." *People v Jackson*, 498 Mich 246, 257; 869 NW2d 253 (2015) (quotation marks and citation omitted).

Corridore's first claim of evidentiary error involves the victim's mother's response when the prosecutor asked her to "tell the jury how it is you approached this with [the victim]?" The victim's mother replied:

> I said well let's sit here and I want to talk to you about something. And I again, as I testified earlier I stated that – you know sometimes someone may hurt their feelings, but – you know if they did something that was wrong sometimes you just have to tell someone even if you think it's going to hurt that person's feelings. And her response was okay.

Defense counsel raised a hearsay objection. The trial court sustained the objection and asked the prosecutor to rephrase the question. The prosecutor asked, "When you introduced the topic that way with [the victim] how did she react?" The victim's mother stated, "Her reaction did not indicate that she had any idea what I was getting at." The trial court again sustained an objection by defense counsel. Thus, the record does not support Corridore's claim on appeal that the trial court erroneously overruled defense counsel's objection. Additionally, the victim's mother's description of the victim's demeanor was not hearsay because her testimony regarding her observations were not an out-of-court statement offered to prove the truth of the matter asserted. *Green*, 313 Mich App at 531; MRE 801.

Corridore's second claim of evidentiary error occurred after the victim's mother stated, "I observed that her face got red. She seemed flushed. She started to cry. She – and her chin quivered. She – her voice shook. She just kind of crumbled." The victim's mother testified that the victim then said, "There is something that happened, but I don't want to tell you what it is." Defense counsel again raised a hearsay objection. The prosecutor argued that the statement was admissible as an excited utterance. The trial court overruled the objection. As discussed earlier, the trial court erred by allowing the statement under the excited utterance exception. However, also as discussed earlier, defense counsel had built a strategy of showing that the victim's allegation of sexual abuse was the product of suggestibility and was influenced by the victim's mother's reinforcement of the victim's disclosure. This strategy was dependent on providing context for the victim's responses to repeated questioning. Indeed, defense counsel subsequently withdrew an objection to the victim's mother's testimony on hearsay grounds. Under these circumstances, Corridore fails to establish that the error undermined the reliability of the verdict. *Jackson*, 498 Mich at 257. Accordingly, the error was harmless.

## IV. PROSECUTORIAL ERROR[3]

Corridore argues that the prosecutor's conduct denied him a fair trial. "[A] defendant must contemporaneously object and request a curative instruction to preserve an issue of misconduct for appellate review." *Solloway*, 316 Mich App at 201 (citation and quotation marks omitted). Corridore did not object to the prosecutor's conduct at trial. Although Corridore raised his claim in a postjudgment motion for a new trial, the motion was not a contemporaneous objection. Therefore, Corridore's claim is unpreserved. "[T]o prevail on a claim of prosecutorial misconduct, a defendant must show that he was denied a fair and impartial trial." *Id*. at 201. "In reviewing prosecutorial misconduct challenges, this Court views the alleged prosecutorial misconduct in context." *Id*. Unpreserved claims of prosecutorial misconduct are reviewed for plain error affecting the defendant's substantial rights. *Id*. at 201-202.

"[T]he prosecutor cannot vouch for the credibility of his witnesses to the effect that he has some special knowledge concerning a witness' truthfulness." *People v Bahoda*, 448 Mich 261, 276; 531 NW2d 659 (1995). "[A] prosecutor may comment on his own witnesses' credibility during closing argument, especially when there is conflicting evidence and the question of the defendant's guilt depends on which witnesses the jury believes." *People v Thomas*, 260 Mich App 450, 455; 678 NW2d 631 (2004). A prosecutor may not express his personal opinion of a defendant's guilt. *Bahoda*, 448 Mich at 282-283.

Corridore cites four instances in which he alleges that the prosecutor violated these standards during closing argument. We find no plain error. Viewed in context, the statement, "those are the emails of a guilty man," was not intended to express the prosecutor's personal opinion of Corridore's guilt, but to express that Corridore's reactions and responses to the victim's father's e-mail attempting to find out what happened to the victim reflected Corridore's consciousness of guilt. The prosecutor argued that the vicitm's father gave Corridore an opportunity to clarify any misunderstanding, but Corridore responded by lashing out at the victim's father, and attempting to defend himself by admitting to other inappropriate conduct. The prosecutor's argument that a child would not invent a story about her grandfather touching her genitals and commenting on her pubic hair was a comment about why the jury should believe the victim's testimony, but it did not suggest that the prosecutor had special knowledge of her truthfulness. The prosecutor's statement that Corridore groomed and assaulted the victim for his sexual gratification was based on the evidence. It did not suggest that the jury should convict Corridore based on the prosecutor's belief in his guilt. The evidence that the victim's extended

---

[3] We note that the parties refer to "prosecutorial misconduct" in their briefing. As recognized by this Court in *People v Cooper*, 309 Mich App 74, 87-88; 867 NW2d 452 (2015), "prosecutorial misconduct" is a misnomer when used to describe technical or inadvertent errors that do not involve illegal conduct or other activity violating the rules of professional conduct. Less extreme errors—those that would not warrant discipline under the rules of professional conduct—are more accurately described as claims of "prosecutorial error." *Id*. Corridore's claim is more appropriately labeled a claim of prosecutorial error because it does not rise to the level of prosecutorial misconduct.

family cut off contact with the victim's immediate family supported the prosecutor's remark that the victim lost her extended family as a consequence of reporting her grandfather's sexual abuse. The prosecutor's comment was meant to urge the jury to infer that the significant burden endured by the victim from revealing the assault, in the face of strong resistance from extended family, supported the credibility of her allegation. Corridore's argument fails to show prosecutorial error.

Corridore also argues that the prosecutor improperly appealed to the jury's sympathy for the victim and a sense of civic duty. When seeking to obtain a conviction, prosecutors must take the highest care to remain mindful that their "role and responsibility is to seek justice and not merely convict." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). Thus, although prosecutors have "discretion on how to argue the facts and reasonable inferences arising therefrom, and are not limited to presenting their arguments in the blandest terms possible," prosecutors must refrain from arguing facts not in evidence when presenting his or her case to the jury. *People v Meissner*, 294 Mich App 438, 456; 812 NW2d 37 (2011). Similarly, "it is improper for a prosecutor to appeal to the jury's sympathy for the victim." *Id*. "Nor may a prosecutor urge the jury to convict as part of its civic duty or on the basis of its prejudices." *Unger*, 278 Mich App at 237. Relying on those means of obtaining a conviction injects issues broader than the defendant's guilt or innocence into a trial and can jeopardize a defendant's opportunity for a fair trial. See *Dobek*, 274 Mich App at 63-64.

Corridore argues that the prosecutor exceeded the bounds of permissible argument by urging the jury to convict Corridore in order to vindicate the victim. He cites the prosecutor's argument that the victim was credible because she gained nothing, but instead suffered a great deal, as a result of accusing Corridore of sexual abuse. The prosecutor commented that all that the victim received in exchange for reporting the sexual assault was "the opportunity to live with what the defendant did to her her whole life," regardless of whether Corridore was convicted. The prosecutor stated:

> The only thing your verdict can do for her is give her some sense that you listened to her and that you believed in her and that you held defendant accountable for what he did to her. That's about the only thing she can get out of this.

In rebuttal argument, the prosecutor questioned why defense counsel tried to draw attention to the evidence that the victim's phone might have been used to view sexually explicit videos that were not introduced into evidence. The prosecutor emphasized that the videos were not downloaded to the victim's phone, and that the phone was not used to search for the videos. He stated, "And counsel's going to attack her and throw mud at her when he doesn't even ask her a single question about something that was actually on the phone."

Although these statements may have had a tendency to evoke sympathy for the victim, the prosecutor did not urge the jury to convict Corridore out of sympathy for the victim or a sense of civic duty. The jury's verdict depended entirely on whether it believed the victim's testimony. The prosecutor's argument that the victim had no motive to lie was an argument based on the evidence presented at trial. To the extent that the argument may have sought sympathy, the invocation was brief and did not overshadow the evidence. Moreover, the trial

court instructed the jury "not to consider things like sympathy for one side or the other." The court also stated that "[t]hings like sympathy and consequences or anything else that you might come up with are not your job. . . . And I'll ask you not to consider those things. . . . Just determine the facts and apply the law." The trial court's instructions, which "jurors are presumed to follow," *Unger*, 278 Mich App at 235, 237, were sufficient to protect Corridore's substantial rights, and Corridore has not shown prosecutorial error.

## V. GUIDELINES SCORING

Corridore challenges the trial court's scoring of OVs 10 and 13 of the sentencing guidelines. In reviewing a defendant's claim that the trial court assigned an improper score to an offense variable, this Court reviews for clear error the trial court's factual determinations, which must be supported by a preponderance of the evidence. *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016). The trial court's interpretation and application of the statutory guidelines is reviewed de novo. *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004).

Preliminarily, we conclude that Corridore's scoring challenges are moot. The sentencing guidelines are a tool for determining a defendant's minimum sentence. Where a defendant has already served his minimum sentence, any error in scoring the guidelines is moot because this Court is unable to provide a remedy for the alleged error. *People v Tombs*, 260 Mich App 201, 220; 679 NW2d 77 (2003), aff'd 472 Mich 446 (2005). The trial court sentenced Corridore in April 2017 to a minimum term of 19 months, with credit for 30 days served. According to the Michigan Department of Corrections' Offender Tracking Information System website, Corridore was paroled from prison on October 30, 2018. Because Corridore has fully served his minimum sentence, this issue is moot.

Affirmed.

/s/ Thomas C. Cameron
/s/ Jane E. Markey
/s/ Stephen L. Borrello